IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN R. FISHER,

Plaintiff,

v.

MEGAN L. KING, ESQ., Individually and in her
official capacity as Assistant District Attorney for
Lancaster County, Pennsylvania, and ERIC
ZIMMERMAN, Individually and in his official
capacity as Detective for Northern Lancaster
County Pennsylvania Regional Police Department,

Defendants.

CIVIL ACTION
NO. 15-6134

## MEMORANDUM OPINION

**Schmehl, J.   /s/ JLS**                                              **September 22, 2017**

## I.    INTRODUCTION

Plaintiff, John R. Fisher ("Fisher" or "Plaintiff") brings this suit against Defendants

Assistant District Attorney Megan King ("King") and Detective Eric Zimmerman

("Zimmerman") for alleged violations under § 1983. Specifically, Plaintiff alleges

malicious prosecution and abuse of process as to both Defendants. Before the Court is the

Motion for Summary Judgment of Defendant King, the Motion for Summary Judgment

of Defendant Zimmerman, the parties' Joint Statement of Material Facts, Plaintiff's

Counter-Statement of Material Facts, Plaintiff's opposition to the motions, and

Defendants' replies. After oral argument on the motions, for the following reasons,

Defendants' motions are granted.

## II.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material

fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### III.  FACTUAL BACKGROUND

Plaintiff is married to Susanne Fisher, the daughter of Dorothy Hoover, who is currently 88 years old. (Joint Statement of Material Facts, ¶¶ 1-2.) Susanne Fisher's father and Dorothy Hoover's husband, Robert Hoover, passed away on December 2, 2009 at the age of 85. (JSOF at ¶ 4.) Susanne Fisher has two siblings, Rebecca (Hoover) Holderman and Stephen Hoover. (JSOF at ¶ 6.)

Plaintiff is both a certified public accountant and a certified financial planner. (JSOF at ¶¶ 8-9.) In 2005, Plaintiff began working as a broker-dealer and registered investment advisor for Genworth Financial Services. (JSOF at ¶ 10.) Plaintiff was the accountant, financial planner, investment advisor and broker for Dorothy and Robert Hoover from 2005 until 2010. (JSOF at ¶ 11.) Plaintiff was Robert Hoover's joint power of attorney along with Dorothy Hoover from June 6, 2006 until Robert Hoover's death in December 2009. (JSOF at ¶ 12.) Plaintiff was Dorothy Hoover's power of attorney from June 6, 2006 until May of 2010. (JSOF at ¶ 13.) Plaintiff "provided advice and recommendations as to investment vehicles for the money that was inherited by Mr. Hoover and Mr. Hoover's funds were invested with Genworth Financial Services, Inc. in a variety of sound investments that realized significant increases in value." (JSOF at ¶ 15.) In July of 2006, Dorothy and Robert Hoover set up a joint account at Genworth Financial in their names with joint rights of survivorship with Plaintiff as the financial representative and advisor on the account. (JSOF at ¶ 14.)

In 2007, Robert and Dorothy Hoover inherited a large sum of money from a relative named Ann Briggs. (JSOF at ¶ 18.) That inheritance was deposited into Robert and Dorothy Hoover's joint investment account with Genworth Financial, and Plaintiff provided investment advice and recommendations on the money in that account. (JSOF at ¶¶ 19-20.)

Robert Hoover was first admitted to Moravian Manor on May 14, 2008, and died there on December 2, 2009. (JSOF at ¶¶ 21, 40.) His admission papers note dementia, "memory issues," "confusion," and "does not comprehend well." (ECF No. 41, Ex. 9, Robert Hoover June 21, 2008 medical record.) Robert Hoover was transferred from a

traditional skilled nursing unit to the locked dementia unit on June 11, 2009 as a result of increasing confusion and behavioral issues. (ECF No. 41, Ex. 7, 9/25/13 correspondence from Moravian Manor.) On July 16, 2009, Robert was diagnosed with dementia, "possible Alzheimer's Type" with associated behavioral problems. (Id.) Robert was admitted to the hospital on August 12, 2009 and again on August 20, 2009 for severe confusion. (ECF No. 41, Exs. 11, 14, Robert Hoover medical records.) He died on December 2, 2009, and his cause of death was noted on his death certificate as Severe Dementia, Pneumonia/Sepsis. (JSOF at ¶ 40.)

Plaintiff, Susanne Fisher, Rebecca and Ken Holderman and Dorothy Hoover took a family vacation to Virginia Beach, VA for a week in August of 2009. (JSOF at ¶ 41.) On August 27, 2009, they had a family meeting, at which time Plaintiff claims Dorothy Hoover signed a letter authorizing the transfer of an account held by her and Robert to an account owned by Susanne Fisher and Rebecca Holderman, two of the three Hoover children. (JSOF at ¶¶ 43-44.) The letter was addressed to Genworth Financial – John R. Fisher, CPA, CFO, and was postdated August 30, 2009. (JSOF at ¶¶ 46-47.) Dorothy Hoover claims that on August 27, 2009, Plaintiff presented a packet to her that included the transfer letter and tax documents and that she and Plaintiff discussed income and long-term care for Robert Hoover. (JSOF at ¶ 48.) The next day, Dorothy Hoover returned to Pennsylvania with the Holdermans, visiting Robert Hoover at Moravian Manor upon their return. (JSOF at ¶¶ 50-51.) Plaintiff did not witness Dorothy Hoover obtain Robert Hoover's signature on the transfer letter. (JSOF at ¶ 53.)

A Genworth joint investment account was set up in the names of Susanne Fisher and Rebecca Holderman with Plaintiff listed as the financial representative and advisor

on the account. (JSOF at ¶ 54.) Plaintiff signed as the registered representative on the account on August 31, 2009, and Susanne Fisher and Rebecca Holderman's signatures on the account are also dated August 31, 2009. (JSOF at ¶ 55-56.) This is the account into which Dorothy and Robert Hoover's funds were transferred in September of 2009. (JSOF at ¶¶ 60-61.) Plaintiff provided the transfer letter to Genworth in order to effectuate the transfer of funds. (JSOF at ¶ 62.) In October of 2009, Dorothy Hoover sent Plaintiff a check for $30,000.00 payable to Pershing, the investment custodian, and noted "investment" in the memo portion of the check. (JSOF at ¶ 66.) In January of 2010, Plaintiff directed Dorothy Hoover to send another $150,000 payable to Pershing "in order to earn interest income on Bob's inheritance funds from Ann Briggs, as well as to provide you with more adequate cash flow." (JSOF at ¶ 67.)

After Robert Hoover died in December of 2009, Dorothy Hoover asked several times where the money in question had gone, asked for information about the transfer of funds, and asked for the money to be returned to her account. (JSOF at ¶ 68.) In a letter dated April 6, 2010, Susanne Fisher wrote to her mother and stated that Dorothy's account no longer existed but was transferred to Susanne and Rebecca out of a fear that Robert Hoover would outlive Dorothy. (JSOF at ¶¶ 70, 71.) Dorothy asked Plaintiff for information on the account prior to meeting with her attorney, and Dorothy's attorney also asked for information regarding her assets. (JSOF at ¶¶ 73, 75.) Neither Susanne Fisher nor Plaintiff provided any documentation to Dorothy or her attorney upon their request. (JSOF at ¶¶ 72, 74, 76.)

On June 10, 2010, Plaintiff emailed Dorothy Hoover, noted that her Genworth account was being transferred and that he was cutting ties with Dorothy and she would

not be permitted in his home. (JSOF at ¶¶ 77, 78.) On June 16, 2010, Dorothy replied that she lacked "understanding about what I signed in Williamsburg . . .[and] the fact that I could not get into my own money was what deeply affected and concerned me and prompted me to act in my own best interests since I never received a copy of what I signed." (JSOF at ¶ 79.) Dorothy continued to ask Susanne about the money in question, stating on September 10, 2010: "There are things I am in the dark about, I need to know who is the beneficiary of the money in the irrevocable trust . . . If you and Becky are the sole recipients I need to know that. It has to be clear if you are going to include Stephen . . . If I am incorrect about the trust, please make me aware of what the truth is." (JSOF at ¶¶ 81, 83.)

In the summer of 2011, the Lancaster Office of Aging ("LOA") began investigating the transfer of funds for possible financial exploitation of Dorothy Hoover. (JSOF at ¶ 85.) Dorothy gave a statement to the LOA, indicating that she was asked to sign something in August of 2009, that she was not aware of what she had signed, that she never intended to give a gift to her daughters, that she still wanted to be in control of her funds, and that she had no knowledge of the "huge amount of my personal funds" being transferred. (JSOF at ¶¶ 86, 91, 92; ECF No. 41, Ex. 34, Dorothy Hoover statement to Lancaster Office of Aging.) Dorothy told the LOA that she thought the conversation with her family dealt with addressing the mounting healthcare costs for herself and her late husband, and stated that "It was made clear that I wanted my funds to be protected for tax purposes for me, but that I would have control of them when my own need arose." (JSOF at ¶¶ 93, 94.) Dorothy stated that she had no intention to exclude her son Stephen Hoover, and that Stephen would never have been excluded if she had known the

document was creating a gift. (ECF No. 41, Ex. 34, Dorothy Hoover statement to LOA.) Dorothy indicated that Susanne Fisher stopped sending her financial records after the transfer occurred. (JSOF at ¶ 97.) Dorothy stated that she was told the document created an "irrevocable trust" under her daughters' control, and that since her funds had been transferred and after Robert's death, she repeatedly had asked for information and funds for her expenses and had been routinely denied such funds. (JSOF at ¶ 99, ECF No. 41, Ex. 34, Dorothy Hoover statement to LOA.)

The LOA spoke with Ken Holderman by telephone, who stated: "Trust was set up at the time when Mr. Hoover could no longer make decisions and they feared the money would be gone through. They set it up to protect her." (JSOF at ¶ 102.) Mr. Holderman informed the LOA that at the time of the transaction in August of 2009, Robert Hoover could not make decisions. (ECF No. 41, Ex. 36, Notes of Interview between LOA and Holderman contained in e-mail.) Mr. Holderman acknowledged that Dorothy had asked for the money back, but that they would not give it back because they were afraid Dorothy would make poor decisions with the money.  (JSOF at ¶ 105, ECF No. 41, Ex. 36.)

On September 9, 2011, the LOA sent Plaintiff and Susanne Fisher a letter notifying them of a report of need that had been sent concerning Dorothy, and asking for their help in investigating the matter. (JSOF at ¶ 107, 108.) LOA asked Plaintiff and Susanne Fisher to send the "Gift of Trust" that was presented to Dorothy to sign in 2009, as well as additional financial records since the date of signature. (JSOF at ¶ 109.) The LOA also asked Plaintiff and Susanne Fisher to discuss the matter surrounding the trust and denial of written documentation. (JSOF at ¶ 110.) Susanne Fisher responded to this

letter, reporting that there was no trust and that "my late father and mother chose to give to my sister and I in 2009, a financial gift," and that "any documentation regarding that gift would be in my mother's possession." (JSOF at ¶ 111, 112, 114.) Plaintiff and Susanne Fisher did not produce any records to the LOA, so on November 15, 2011, the LOA obtained a court order to obtain all necessary financial documents to conduct an investigation. (JSOF at ¶ 115, 116.)

Genworth released the transfer letter to the LOA on December 2, 2011, and on December 6, 2011, Susanne Fisher sent the transfer letter to Dorothy with an email. (JSOF at ¶¶ 117, 118.) Susanne Fisher's email stated, in pertinent part: "Here is the document you have wanted to see for awhile. YES, it is SIGNED by YOU and MY late FATHER. . . Your last attack is unthinkable, having office of the aging investigating Jack with Genworth. IF he loses his license I hold you TOTALLY responsible. We only had good intentions for you and your future and you have turned this into a battle. We did NOTHING wrong." (JSOF at ¶ 118.)

In the summer of 2012, LOA provided its investigation materials to Detective Zimmerman for him to conduct a criminal investigation. (JSOF at ¶ 120.) Zimmerman met with Dorothy Hoover approximately eleven times to investigate, starting on August 1, 2012. (JSOF at ¶ 122.) Dorothy told Zimmerman that her daughters Susanne Fisher and Rebecca Holderman, as well as Plaintiff, discussed with her reinvesting funds for future care in an account that she shared with her husband, and gave her a piece of paper to sign. (ECF No. 41, Ex. 18, Dorothy Hoover dep., pp. 36-37, 57-58, 60, 76.) Dorothy did not read the document because she trusted them. (Id. at pp. 37, 43, 63, 158.) Dorothy denied authorizing a complete transfer of funds in 2009, (JSOF at ¶ 127) and stated that

she would not have agreed to give funds only to her daughters and exclude her son. (ECF No. 41, Ex. 18, Dorothy Hoover dep., pp. 40-41, 60-61, 99.) Dorothy told Zimmerman that after Robert died, she began asking Plaintiff and Susanne Fisher about the account and for a return of her money, but that the Fishers began to threaten and intimidate her. (ECF No. 41, Ex. 39, Prelim. hearing, pp. 72-73, 75-76; Ex. 34, Dorothy Hoover statement to LOA, p. 1.) Dorothy told Zimmerman that she replaced Plaintiff with Michael Kane, Esq. as her power of attorney in April of 2010, and that Mr. Kane asked the Fishers for a summary of the assets related to the account, and that the Fishers did not respond. (JSOF at ¶ 130, 131, ECF No. 41, Ex. 39, Prelim hearing, p. 77, Ex. 15, Zimmerman dep., pp. 130-131.) When shown the transfer letter in question, Dorothy told Zimmerman that she did not recall signing it or reading it. (ECF No. 41, Ex. 15, Zimmerman dep., pp. 35-36, 58-59; Ex. 39, Prelim hearing, pp. 23-24.)

Dorothy also told Zimmerman that Robert Hoover had severe dementia in August of 2009 and would have been unable to understand financial transactions, but that she and Plaintiff had power of attorney for him. (JSOF at ¶¶ 135, 136.)

In October of 2012, Zimmerman called the Fishers as part of his investigation. (JSOF at ¶ 139.) Plaintiff denied any theft of funds, told Zimmerman that he "can't give the money back" because it wasn't his money, "Robert's dead," and "It's three years later," and denied having anything to do with obtaining Robert Hoover's signature on the transfer letter. (JSOF at ¶¶ 142, 143, 144.)

Zimmerman attempted to contact Rebecca Holderman by phone and email, as she was residing in the Canary Islands, but she never returned his calls or emails. (JSOF at ¶ 148, 149.) Zimmerman obtained the relevant financial records, which showed that

$696,033 was transferred from the Hoovers' account and into a new account formed by Plaintiff and held by Susanne Fisher and Rebecca Holderman. (ECF No. 41, Ex. 39, Prelim hearing, pp. 19, 25, 47-48.) Zimmerman obtained Robert Hoover's medical records and went to Moravian Manor several times for the purpose of determining Robert Hoover's mental capacity in August of 2009. (JSOF, ¶ 152.)

Zimmerman received approval from ADA Megan King to file charges, and did so on April 17, 2013 against Plaintiff, Susanne Fisher and Rebecca Holderman. (JSOF at ¶¶ 153, 155.) Plaintiff's attorney made arrangements with Zimmerman for Plaintiff to turn himself in on May 14, 2013 for booking, mug shots and fingerprints. (JSOF at ¶ 156.) Plaintiff was never placed in handcuffs or placed in a police cruiser, and never spent any time in a cell. (JSOF at ¶ 157.) Plaintiff was made to wait in a room alone without his wife, but never posted bail or any other collateral, as he received $200,000 unsecured/ROR bail. (JSOF at ¶¶ 158, 160.) Plaintiff did not have to surrender his passport, was not subject to any travel restrictions, and did not have to report to pretrial services or probation. (JSOF at ¶¶ 161, 162.)

After Zimmerman's 9 month investigation in this matter, ADA King approved charges of theft by deception, criminal conspiracy, securing execution of documents by deception, and deceptive/fraudulent business practices against Plaintiff, Susanne Fisher and Rebecca Holderman. (JSOF at ¶ 163.) On November 8, 2013, the Preliminary Hearing was held and Magisterial Judge Rodney Hartman bound all charges over for trial in the Court of Common Pleas against Plaintiff, Susanne Fisher and Rebecca Holderman. (JSOF at ¶ 166.) Rebecca Holderman agreed to return her half of the account to Dorothy Hoover, and just prior to trial, Plaintiff and Susanne Fisher entered into a Rule 586 Non-

Trial Disposition pursuant to Rule 586 of the Pennsylvania Rules of Criminal Procedure. (JSOF at ¶¶ 169, 171.)

## IV.    **DISCUSSION**

Plaintiff's Complaint contains 2 counts: Count I under section 1983 for malicious prosecution and Count II under section 1983 for abuse of process. Both Defendant King and Defendant Zimmerman filed motions for summary judgment, claiming Plaintiff cannot establish the necessary elements to prove either malicious prosecution or abuse of process. For the reasons set forth below, I agree and will grant Defendants' motions and dismiss Plaintiff's Complaint.

### A.  MALICIOUS PROSECUTION

In order to sustain a federal malicious prosecution claim under § 1983, Plaintiff must show that "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Kossler v. Crisanti, 564 F.3d 181, 186 (3d Cir. 2009). In this type of case, Plaintiff must meet each of the five elements in order to be successful. Kossler, 564 F.3d at 186. Defendant King argues that Plaintiff in this matter cannot establish 4 of the 5 elements necessary for his malicious prosecution claim.[1] Defendant Zimmerman further argues that Plaintiff cannot prove that Zimmerman initiated the prosecution, therefore failing to meet all 5 elements. Both

---

[1] Defendant King does not contend that the first element – criminal proceedings were initiated – was not met.

Defendants concentrated their arguments to a large degree on probable cause, so I will begin my analysis with that element.

### 1. **Probable Cause**

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. Therefore, the evidentiary standard for probable cause is significantly lower than the standard which is required for a conviction." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citing Adams v. Williams, 407 U.S. 143, 149 (1972). "An arrest was made with probable cause if 'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense." Id. (quoting Beck v. Ohio, 379 U.S. 89 (1964)).

"In determining whether probable cause exists, police officers are permitted to rely upon statements of eyewitnesses or victims if they reasonably believe the statements are credible." Murray v. City of Pittsburgh, 2011 WL 3209090, *4 (W.D. Pa., July 28, 2011) (citing Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000)). "[W]hen an officer 'receives this information from some person-normally the putative victim or eyewitness-who it seems reasonable to believe is telling the truth,' he has probable cause to arrest the accused perpetrator." Id. (quoting Lynch v. Donald Hunter Safeguard Sec., Inc., 2000 WL 1286396 (E.D. Pa., Sept. 1, 2000)).

A review of the undisputed facts in this matter clearly shows that there was probable cause to arrest Plaintiff. First, the Lancaster County Office of Aging had

investigated possible financial exploitation of Dorothy Hoover. Dorothy told the Office of Aging caseworker that she did not intend to gift this money to her daughters, that she wanted to maintain control over the money, and that she never would have given this money to her daughters and not included her son Stephen Hoover. When the Office of Aging contacted the Fishers as part of their investigation and for assistance in gathering the relevant financial documents to review, Susanne Fisher responded by telling them that there was no trust and that the money was a gift to she and her sister. Plaintiff and Susanne Fisher did not produce any records to the LOA investigator.

Having received no cooperation from the Fishers, the LOA turned the investigation over to Detective Zimmerman, who performed a thorough investigation that lasted over eight months. Zimmerman met with Dorothy over ten times, and she consistently told him that Plaintiff, Susanne Fisher and Rebecca Holderman confronted her on their family vacation in August of 2009 about reinvesting funds from her shared account with Robert Hoover and gave her a piece of paper to sign. Dorothy informed him that they had never discussed this matter previously and she did not read the document that she signed because she trusted them. Dorothy consistently told Zimmerman that she did not knowingly agree to give up all control of her and Robert's money and that she was deceived into transferring her money to her two daughters, to the exclusion of her son Stephen. Dorothy also told Zimmerman that after her husband died in December of 2009, she began asking Plaintiff and Susanne Fisher about the account and for a return of her money, but that the Fishers began to threaten and intimidate her. Dorothy stated that when she appointed Michael Kane, Esq. as power of attorney to replace Plaintiff, he

asked the Fishers in writing for a summary of the account assets, but the Fishers failed to respond.

Zimmerman's investigation revealed that Plaintiff was Dorothy and Robert Hoover's accountant, financial planner, investment advisor and broker, as well as being Dorothy's power of attorney from June of 2006 until May of 2010, and Robert's power of attorney from June of 2006 until his death.

Zimmerman further learned that at the time Robert Hoover allegedly signed the transfer letter in August of 2009, he was a resident of Moravian Manor in the secure dementia unit, with a diagnosis of dementia and frequent confusion. He also learned that Plaintiff was the one who helped Dorothy and Robert set up their original Genworth Financial account in which they placed the inherited money that was later transferred to Susanne Fisher and Rebecca Holderman. Further, he learned that Plaintiff was the individual who assisted Susanne Fisher and Rebecca Holderman in opening the account into which the Hoovers' money was transferred on August 31, 2009.

Dorothy Hoover's statements to Zimmerman alone resulted in sufficient probable cause for Zimmerman to believe that Plaintiff and his wife and sister-in-law had misled Dorothy about the financial transaction in question. Plaintiff argues that Dorothy gave inconsistent statements to Zimmerman, at one point telling him that she did not recognize or remember signing the transfer letter, then later telling him that she does remember signing something. First, these statements are not necessarily inconsistent. It is entirely possible for Dorothy to sign something and not remember signing it nor remember what she signed, and then remember signing something but failing to recognize the letter she signed years later. However, even if Dorothy's statements to Zimmerman were

inconsistent, Zimmerman would still have had probable cause in this matter, because there was no inconsistency in Dorothy's repeated statements that Plaintiff misled her about the transfer and that she never would have gifted her money to her daughters and excluded her son.

In addition to credible information from Dorothy, information regarding Mr. Hoover's mental state at the time he allegedly agreed to the transfer, information obtained from the LOA after their investigation, Plaintiff's refusal to cooperate with the investigation or provide any information to Dorothy, her attorney, the LOA or Detective Zimmerman about the transfer was further evidence of probable cause. Probable cause existed to allow Zimmerman to believe at the time of his investigation that Plaintiff had taken advantage of his close personal relationship and his financial advisory relationship with the Hoovers to direct a large sum of money into an account to benefit his wife and sister-in-law.

As stated above, all that needs to be considered to determine the existence of probable cause is the "facts and circumstances within [the officer's ] knowledge" at the time of the arrest. Wright v. City of Philadelphia, 409 F.3d at 602. To that end, Detective Zimmerman was permitted to rely on information from a victim such as Dorothy Hoover as long as he reasonably believes her statements are credible. Murray v. City of Pittsburgh, 2011 WL 3209090, at * 4 (W.D. Pa. July 28, 2011). It is also note-worthy that both the Judge who approved the arrest warrant and the Magisterial District Judge who bound the charges over found that probable cause existed. This is additional evidence that Zimmerman had probable cause for the charges. See McGowan v. Borough of Ambridge, 2008 WL 4200153, at *8 (W.D. Pa. Sept. 5, 2008) (quoting Tarlecki v. Mercy Fitzgerald

Hospital, 2002 WL 1565568, at *3 (E.D.Pa. July 15, 2002)) ("[w]hile not conclusive evidence of the existence of probable cause, a decision of a neutral district justice to hold over Plaintiff for trial on the charges constitutes 'weighty evidence' that [defendant] had probable cause to request issuance of the arrest warrant.")

In opposing the motion for summary judgment, Plaintiff has filed twenty-four pages of "Counter-Statement of Material Facts." With regard to these facts, it is important to first note that any facts that Detective Zimmerman was unaware of at the time of his investigation are immaterial to the determination of whether he had probable cause to arrest Plaintiff. Therefore, many of the "facts" set forth by Plaintiff are irrelevant and cannot create a genuine issue of material fact for summary judgment purposes. This issue must rise or fall on the facts as known by Detective Zimmerman.

To address some of the specific facts alleged by Plaintiff, I first consider Plaintiff's arguments regarding his status as Dorothy and Robert's power of attorney. Plaintiff claims that ADA King and Detective Zimmerman "alleged that Plaintiff exercised his Power of Attorney in effectuating Dorothy Hoover's signature . . . and thereafter secured Robert Hoover's signature . . . through his Power of Attorney." (Pl's Brief in Opposition to Summ. Jdgmt, p. 7.) However, a review of Affidavit of Probable Cause shows that the only mention made of Plaintiff being the Hoovers' power of attorney was the mere fact that he was the power of attorney at the time of the transaction. Further, ADA King testified at her deposition that although Plaintiff was the power of attorney, "he did not act as power of attorney" in executing the transfer documents. (ECF No. 41, Ex. 40, Megan King dep., p. 107.) Neither Zimmerman nor King accused Plaintiff at any time of actually *acting* as power of attorney for Dorothy

and Robert and executing the transfer letter on their behalf. Rather, the allegations in the affidavit of probable cause were most likely intended to show that Plaintiff was in a position of trust with Dorothy and Robert as their power of attorney.

Plaintiff also makes much of an alleged affair that Robert Hoover had with a member of his congregation, speculating that Dorothy was worried that Robert would give money to his mistress if Dorothy died first. However, Plaintiff has presented no evidence that Detective Zimmerman knew about this information at the time charges were brought against Plaintiff. Therefore, it is irrelevant, as is Plaintiff's allegation that Robert was abusive toward Dorothy.

Also irrelevant is Plaintiff's allegation that the Hoovers removed their son, Stephen Hoover, as a beneficiary to their IRA and executor to their wills. Plaintiff has presented no evidence that Zimmerman knew of these facts at the time he filed charges.

Similarly, Plaintiff discusses a conversation between Robert and Dorothy Hoover and he and Susanne Fisher in May of 2009 where the Hoovers requested that the inherited money be transferred to their daughters, excluding their son Stephen. (Pl's Brief, p. 17.) Again, there is no evidence put forth by Plaintiff that Zimmerman knew about this alleged conversation at the time charges were filed against Plaintiff. Perhaps if Plaintiff had responded to the LOA or Detective Zimmerman when the investigation was occurring, he could have provided this evidence to them. But he did not, and it cannot be considered in determining whether there was probable cause to arrest him.

In summary, despite his attempts to muddy the waters with irrelevant facts, Plaintiff cannot identify any material facts that were contained in the affidavit of probable cause that were not true. Therefore, upon review of the undisputed facts considered by

Detective Zimmerman and contained in his affidavit of probable cause, it is clear that probable cause existed. Accordingly, this element of Plaintiff's malicious prosecution claim cannot be met, and I will grant summary judgment on this issue.[2]

### 2. __Favorable Termination__

The favorable-termination rule was first set out in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), wherein the United States Supreme Court stated:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus…A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

<u>Heck</u>, 512 U.S. at 486-87. In 2005, the Third Circuit interpreted <u>Heck</u> to mean that "a §1983 action that impugns the validity of the plaintiff's underlying conviction cannot be maintained unless the conviction has been reversed on direct appeal or impaired by collateral proceedings." <u>Gilles v. Davis</u>, 427 F.3d 197, 208-09 (3d Cir. 2005).  It is undisputed that in order to pursue a claim for malicious prosecution and avoid the application of the <u>Heck</u> doctrine, Plaintiff's criminal case must have concluded in a manner indicating his innocence. In short, the criminal case must have resulted in a "favorable termination" for Plaintiff. <u>Heck</u>, 512 U.S. 477. The Third Circuit has held that a plaintiff alleging malicious prosecution must prove actual innocence to satisfy the

---

[2] As Plaintiff needs to meet all five elements to be successful on a claim of malicious prosecution, and I have found that he did not meet the lack of probable cause element, he will be unable to prove malicious prosecution, and my analysis could end there. However, out of an abundance of caution, I will analyze the remaining elements.

favorable termination requirement. <u>Marable v. W. Pottsgrove Twp.</u>, 2005 WL 1625055, at *8 (E.D. Pa., July 8, 2005) (<u>citing</u> <u>Hector v. Watt</u>, 235 F.3d 154, 156 (3d Cir. 2000)).

In the instant matter, just prior to trial, Plaintiff and his wife entered into a 586 plea. (JSOF at ¶ 171.) This type of plea is entered into pursuant to Pa. Rule of Criminal Procedure 586, which states:

> When a defendant is charged with an offense which is not alleged to have been committed by force or violence or threat thereof, the court may order the case to be dismissed upon motion and a showing that:

> (1) The public interest will not be adversely affected; and

> (2) The attorney for the Commonwealth consents to the dismissal; and

> (3) Satisfaction has been made to the aggrieved person or there is an agreement that satisfaction will be made to the aggrieved person; and

> (4) There is an agreement as to who shall pay the costs.

Pa. R.Crim. Pro. 586. In this case, Plaintiff and his wife entered into a 586 plea, where the money was returned to Dorothy Hoover and charges were dropped against both Plaintiff and Susanne Fisher. The question is whether this type of compromise and resolution of a criminal case is consistent with Plaintiff's "actual innocence," as required by the favorable termination rule. Plaintiff argues that his wife was required to return the money to Dorothy Hoover pursuant to the 586 plea, not him, and therefore the compromise reached did not apply to him and therefore, this action was terminated in his favor.

In support of his argument, Plaintiff cites to <u>Georgina v. United Mine Workers of America</u>, 572 A.2d 232 (Pa. Super. 1990) and <u>Hilfirty v. Shipman</u>, 91 F.3d 573 (3d Cir. 1996). <u>Georgina</u> involved a husband and wife who brought a claim against the United Mine Workers for wrongful use of criminal proceedings after the wife of the co-

defendant husband entered into a settlement agreement pursuant to which the complaint for fraud against she and her co-defendant husband was dropped. 572 A.2d 232. The Superior Court found that "the question of whether one defendant's settlement of an action should bind another defendant must depend on the particular circumstances surrounding that settlement. Id. at 235. The issue of wife's settlement in Georgina and what effect it had on her husband's right to sue for malicious prosecution was to be a question reserved for the fact-finder. Id.

In Hilfirty, a spouse agreed to enter into an agreement with prosecution in exchange for entry into the ARD program, and in return, the charges against his wife would be *nolle prossed*. 91 F.3d at 575-577. In that case, the Third Circuit held that "in instances where a party authorizes [his] co-defendant to enter into a compromise agreement providing for the dismissal of [his] criminal charges and [he] offers no consideration in exchange for such dismissal, [he] will not have been found to have relinquished [his] right to file a malicious prosecution claim unless it is plain from the record of a hearing in open court or a written release-dismissal agreement that such relinquishment was knowing, intentional and voluntary." Hilfirty, 91 F.3d at 583-84.

Defendant King argues that this situation is most similar to Merrick v. Kahley, 2013 WL 2392997 (E.D. Pa. June 3, 2013), and McCoy v. Indiana Borough, 2012 WL 3686773 (W.D. Pa. 2012). Although Merrick and McCoy both involved plaintiffs who entered into 586 agreements and were therefore barred by the Heck doctrine from pursuing malicious prosecution claims, these cases are distinguishable from the instant matter because only one defendant was involved in the underlying criminal matter and entered into a 586 plea, not two co-defendants as in the instant case.

Lacking guidance from the courts of this circuit as to the specific factual scenario that I am presented with, I fall back on the Third Circuit decision in <u>Hilfirty</u>, which involved spouses as co-defendants, one of whom entered into an agreement for the dismissal of all charges against the co-defendant spouse. In <u>Hilfirty</u>, the court held that "[i]n order to ensure that no person who may have been subject to malicious prosecution inadvertently or unintentionally waives the right to pursue such claim, we conclude that, in instances where a party authorizes her co-defendant to enter into a compromise agreement providing for the dismissal of her criminal charges and she offers no consideration in exchange for such dismissal, she will not have been found to have relinquished her right to file a malicious prosecution claim unless it is plain from the record of a hearing in open court or a written release-dismissal agreement that such relinquishment was knowing, intentional and voluntary." <u>Hilfirty</u>, 91 F.3d at 583–84. In this matter, as in <u>Hilfirty</u>, there is no evidence presented that Plaintiff "knowingly, intentionally and voluntarily" relinquished his right to file a malicious prosecution claim when he entered into the 586 plea agreement. Therefore, I find that a genuine issue of material fact exists as to this issue and I will not grant summary judgment as to this element because the burden has not been met.

### 3. **Malice**

Another element of a malicious prosecution claim is that the charges had to have been initiated and/or pursued with malicious intent. "Malice has been stated to include ill-will in the sense of spite, the use of a prosecution for an extraneous, improper purpose, or the reckless and oppressive disregard of the plaintiff's rights." <u>Lee v. Mihalich</u>, 847 F.2d 66, 70 (3d Cir. 1988). Further, as argued by Plaintiff, malice can be inferred from the

absence of probable cause. <u>Kelley v. General Teamsters, Local Union 249</u>, 544 A.2d 940, 941 (Pa. 1988). However, as already discussed above, there was sufficient probable cause to prosecute Plaintiff. Therefore, malice cannot be inferred in this matter and Plaintiff must present some evidence of Zimmerman and King's ill will toward him, an improper purpose for the prosecution or a reckless disregard of Plaintiff's rights. Plaintiff's sole argument as to malice is that King knew prior to initiating the prosecution of Plaintiff that Plaintiff did not secure Robert Hoover's signature on the transfer letter and that he never possessed or took any money from Dorothy or Robert Hoover; therefore, King and Zimmerman allegedly continued to pursue Plaintiff despite knowing he did not commit a crime. This argument must fail, because the issue was not whether Plaintiff actually took money from the Hoovers, but whether he used his position of trust to convince them to transfer money to the benefit of his wife. The mere fact that Plaintiff did not acquire Robert's signature or that he never took the money from the Hoovers directly does not defeat the possibility that he wrongfully influenced the Hoovers. Therefore, King and Zimmerman had every right to pursue Plaintiff for the crime that he may have committed. Accordingly, there is no genuine issue of material fact that Zimmerman and King did not act with malice, and I will grant summary judgment as to this element as well.

**4. <u>Deprivation of Liberty</u>**

A plaintiff asserting malicious prosecution must show "some deprivation of liberty consistent with the concept of 'seizure'." <u>Gallo v. City of Philadelphia</u>, 161 F.3d 217, 222 (3d Cir. 1998). Prosecution without probable cause is not, in and of itself, a constitutional tort; rather the constitutional violation is the "deprivation of liberty accompanying prosecution, not prosecution itself." <u>Id.</u> (citing <u>Singer v. Fulton County</u>

Sheriff, 63 F.3d 110, 116 (2d Cir. 1995)). It has been held that there is no seizure and therefore, no constitutional violation where an individual is not arrested, never posted bail, was given no travel restrictions and did not have to report to pre-trial services. DiBella v. Borough of Beechwood, 407 F.3d 599, 603 (3d Cir. 2005).

It is undisputed in this matter that Plaintiff made arrangements to turn himself in for booking, mug shots, and fingerprints. He was never handcuffed, put into a police cruiser or put in jail. Plaintiff did not have to post bail, had no travel restrictions and did not have to report to pretrial services or probation. In support of his claim that he suffered a seizure, Plaintiff claims he was detained for two hours in a small room at the police station without access to his wife or lawyer and was released on $200,000 unsecured bail. Plaintiff was also required to attend hearings on the charges against him. Attendance at trial and other hearings is not a seizure under the Fourth Amendment. Shelley v. Wilson, 152 Fed. Appx. 126, 128 (3d Cir. 2005). Likewise, placing Plaintiff in a small room for two hours does not rise to the level of a burden that results in a seizure. Accordingly, there is no genuine issue of material fact that Plaintiff was not "seized" in violation of the Fourth Amendment, and I will grant summary judgment on this element of the malicious prosecution test as well.

### B. ABUSE OF PROCESS

Like a malicious prosecution claim, a claim for abuse of process requires a lack of probable cause. Shilling v. Brush, 2007 WL 210802, at * 9 (M.D. Pa., Jan. 22, 2007). As discussed thoroughly above, probable cause clearly existed in this matter. Accordingly, Plaintiff cannot establish a necessary element for his abuse of process claim, and summary judgment will be granted on that claim as well.

## V.  <u>CONCLUSION</u>

In conclusion, Plaintiff cannot meet at least three of the five necessary elements for a malicious prosecution claim, nor can he establish the lack of probable cause necessary for an abuse of process claim. Accordingly, Defendants' Motions for Summary Judgment are granted and this case is dismissed.[3] An appropriate order follows.

---

[3] Defendants have also argued that summary judgment should be granted in their favor due to immunity. As I have determined that Plaintiff has not met the prima facie case for either malicious prosecution or abuse of process, I grant Defendants' summary judgment motions on those grounds, and do not need reach the issue of immunity.